Howard A. Belodoff, ISB #2290
Jennifer A. Giuttari, ISB #10008
Idaho Legal Aid Services, Inc.
1447 South Tyrell Lane
Boise, ID 83706
Phone: (208) 336-8980, Ext. 1106 and 1503
Email: howardbelodoff@idaholegalaid.org
        jennifergiuttari@idaholegalaid.org

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| ADELA AYALA, individually, and as next friend of L.O.A., a minor child,<br><br>              Plaintiff,<br><br>     v.<br><br>RICHARD M. ARMSTRONG, in his official capacity as Director of the Idaho Department of Health and Welfare and ELKE SHAW-TULLOCH, in her official capacity as Administrator of the Division of Public Health, Bureau of Vital Records and Health Statistics,<br>                        Defendants.<br>_____ | Case No. 1:16-cv-00501-BLW<br><br>**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** |

COME NOW the Plaintiffs, to file pursuant to Fed. R. Civ. P. 56, this Memorandum in

Support of Plaintiffs' Motion for Summary Judgment.

## I.  INTRODUCTION

Plaintiffs' Complaint contends Idaho's statutes that govern the issuance of birth

certificates and births by artificial insemination deny same-sex parents of their rights to equal

protection and due process under the Fourteenth Amendment to the United States Constitution.

*See* Idaho Code §§ 39-240 et seq. and 39-5401 et seq. (2016). Plaintiffs contend gay and lesbian

couples and their children cannot receive the same rights that are afforded to opposite-sex

couples and their children. Plaintiffs further contend that the Artificial Insemination Act discriminates against gay and lesbian couples by excluding them from protections granted to "married" opposite-sex couples who consent to artificially conceiving a child and subject same-sex couples to criminal penalties, including fines and incarceration, if they consent to conceive a child. Plaintiffs also contend that the statute's unequal treatment of gay and lesbian couples, whether married or unmarried deprive them of the fundamental rights associated with family relationships, procreation, and childrearing. Plaintiffs seek declaratory and injunctive relief declaring the statutes are unconstitutional. Plaintiffs request the Court order Defendants to recognize Plaintiffs' parental and familial relationship by applying the statutes in a sex-neutral manner and to issue an amended birth certificate to reflect that Ms. Ayala and L.O.A.'s parent-child relationship is legally recognized.

## PROCEDURAL BACKGROUND

Plaintiffs requested the Court to issue a preliminary injunction ordering Defendants to apply "'Idaho's Paternity Act, Vital Statistics Act, and Artificial Insemination Act in a sex-neutral manner and recognize the parentage of gay and lesbian couples and their children, and issue Plaintiffs an amended two-parent birth certificate recognizing Plaintiff Ayala as the parent of minor child L.O.A.'" Dkt. 31 at 2-3 (quoting Complaint Dkt. 1). Defendants filed a Motion to Dismiss, contending that the Complaint is barred by the Eleventh Amendment's sovereign immunity and that the Court lacked subject matter jurisdiction because Plaintiff Ayala lacked standing. *Id*. at 3.[1]

The Court found that Plaintiff Ayala had presented "substantial evidence" that she "would have been married at the time of L.O.A.'s conception or birth, but for the same-sex

---

[1] Defendants did challenge the standing of Plaintiff L.O.A.

marriage ban in Idaho." *Id*. at 6. The Court further found that, if Plaintiff Ayala had been married, she "would have been listed as a parent of L.O.A. on the birth certificate pursuant to I.C. §§ 39-255 and 39-5405." *Id*. The Court held that sovereign immunity did not apply because "the State of Idaho's past unconstitutional acts have led to 'continuing conditions of inequality' for same-sex couples who desired to marry but were unconstitutionally denied that right by the State of Idaho." *Id*. at 5 (citing *Obergefell v. Hodges,* ___ U.S. ___, 135 S. Ct. 2584 (2015)). The Court denied the Motion to Dismiss because Plaintiff Ayala's "name remains absent from the birth certificate because of that discrimination." *Id*. at 7.

The Court first determined that Plaintiffs had standing to pursue the claim that the Vital Statistics Act, I.C. § 39-255(e)(1), was unconstitutional. *Id*. at 8. The Court found Plaintiffs asserted an injury in fact "because the State of Idaho prevented her from being married to L.O.A.'s birth mother" and the statute "prevented her from being entered as a parent on L.O.A.'s birth certificate." *Id*. The Court further found because the statute "prevented Ayala from having all the rights of a legal parent to L.O.A" the "injury is directly traceable to the State of Idaho's unconstitutional laws preventing same-sex marriage and parenthood based upon that marriage." *Id*. The Court further found the "injury will likely be redressed by a favorable decision that Ayala would have been named as L.O.A.'s parent but for these unconstitutional laws. . . ." *Id*.

The Court also determined that Plaintiffs had standing to purse the claim that the Artificial Insemination Act, I.C. § 39-5405(3), was unconstitutional. *Id*. at 9. The Court found Plaintiffs had asserted an injury-in-fact "because the State of Idaho prevented Ayala from being married to L.O.A.'s birth mother at the time of conception and birth" and the statute "prevented Ayala from having all the rights of a legal parent to L.O.A." *Id*. The Court further found the "injury is directly traceable to the State of Idaho's unconstitutional laws. And the injury would

likely be redressed by a favorable decision that Ayala would have been given parental rights but for the State of Idaho's laws." *Id*. Finally, the Court held that Plaintiffs did not have standing to pursue the claim under the Paternity Act that, I.C. § 7-1106, was unconstitutional.

## II.   FACTUAL BACKGROUND

Plaintiffs Adela Ayala ("Ms. Ayala") and her former same-sex fiancé, Janina O. ("Janina") moved to Idaho in March of 2011. Declaration of Adela Ayala ("Dec.") at ¶ 2 (Feb. 1, 2018). Ms. Ayala and Janina, prior to their decision to conceive a child, discussed getting married but were prevented from being married because Idaho did not recognize same-sex marriage as being legal. Dec. at ¶ 6. Due to Janina's health concerns, the couple decided to conceive a child in the fall of 2011. Dec. at ¶ 4. In November 2011, Janina became pregnant by artificial insemination using donated sperm.  Dec. at ¶¶ 5, 8.  s. Ayala decided to propose after Janina became pregnant even though they could not legally marry in Idaho. Dec. at ¶¶ 9-10. She purchased an engagement ring and planned to propose in San Francisco during a family visit over the 2011 Christmas holiday. Dec. at ¶¶ 11-15.  They told their families in California and had an engagement party. Dec. at ¶¶ 16-17.

Ms. Ayala and her daughter L.O.A. ("L.O.A.") share a secure and loving parental bond, the foundation of which was established prior to L.O.A.'s birth. Ms. Ayala and Janina jointly selected a sperm donor and agreed that Janina would be the birth mother of their child. Dec. at ¶¶ 4-5. They both selected the OBGY-N, chose the hospital where Janina would give birth, and went to pre-natal appointments. Dec. at ¶ 18-19. They chose the baby's name together. Dec. at ¶ 22. Ms. Ayala was in the delivery room and participated in the birth of L.O.A. in August 2012. Dec. at ¶¶ 23-24. When Ms. Ayala and Janina were requested to complete the required paperwork for obtaining a birth certificate, hospital staff informed Ms. Ayala that she could not

be listed as L.O.A.'s other parent on the birth certificate because Idaho did not recognize same-sex couples as both parents. Dec. ¶ 27. The couple decided not to fill in the "Father's" name on the "Certificate of Live Birth" because Ms. Ayala was L.O.A's other parent, but gave L.O.A. Ms. Ayala's last name in the last name section on the Certificate, on her social security card, and for her health insurance to afford societal recognition of their parent-child relationship. Dec. at ¶ 28.

Ms. Ayala and Janina wanted to be married prior to the birth of L.O.A., but were prevented by Idaho's refusal to recognize same-sex marriages performed in Idaho or in other states. Dec. at ¶¶ 7, 35. At first Janina stayed home to take care of L.O.A. while Ms. Ayala worked and provided financial support for the family. Dec. at ¶¶ 29-33, 36. Over time, Ms. Ayala began to take on the primary parenting duties. Dec. at ¶¶ 36-37. Ms. Ayala's relationship with Janina became increasingly strained so she decided it would be in the best interests of L.O.A. to get married outside the State of Idaho even though Idaho would not officially recognize their marriage. Dec.at ¶¶ 36, 38. On November 23, 2013, Ms. Ayala announced on Facebook that she and Janina set a date for their marriage. Dec. at ¶39. Her post stated, "Its official folk's, were getting married….MAY 16th @ halfmoon bay…" Dec. at ¶ 39. She later decided to postpone the wedding because of Janina's worsening health and substance abuse issues. Dec. at ¶ 40.

In February of 2015, Ms. Ayala ended the relationship. Dec. at ¶ 41. Since that time Ms. Ayala has been L.O.A.'s primary parent and financial supporter. Dec. at ¶ 42. On May 13, 2016, Janina executed a power of attorney giving Ms. Ayala full parental authority over the care of L.O.A. Dec. at ¶ 46. On June 9, 2016, Janina revoked the power of attorney and took L.O.A. to her relatives in California. Dec. at ¶¶ 47-49. In July 2016, L.O.A. was returned to Idaho and has

stayed with Ms. Ayala the majority of the time. Dec. at ¶ 50. In August 2016, the Idaho Department of Health and Welfare ("IDHW"), after an investigation, placed L.O.A. in Ms. Ayala's home. Dec. at ¶ 51-55. IDHW does not legally recognize Ms. Ayala as L.O.A.'s parent but considers her a foster parent with no legal rights. Dec. at ¶ 55-57, 59-64. IDHW can remove L.O.A. from Ms. Ayala's custody at any time and for any reason. Dec. at ¶ 59. Ms. Ayala is not authorized to obtain or sign for any medical treatment that L.O.A may require without IDHW's consent. Dec. at ¶ 60. Ms. Ayala is not allowed to fully participate in the Court's hearings concerning L.O.A.'s custody and care. Dec. at ¶ 57. On November 28, 2017 Janina voluntarily agreed to the termination of her parental rights over L.O.A. Dec. at ¶ 65. On January 30, 2018 the court ordered the termination of Janina's parental rights. The IDHA case manager testified that L.O.A. should be permanently placed in Ms. Ayala's physical and legal custody. Dec. at ¶ 67.

On October 22, 2014 Frank Powell, an IDHW Rules Specialist, wrote to recommend a change in the Vital Statistics Rules, 16.02.08.900.01, as a result of the recent same-sex marriage ruling. Declaration of Howard Belodoff ("Dec. HB") Ex. 1 at 0054-0055. Mr. Powell suggested to amend the "Form of Consent" rule by changing "wife" and "husband" to "each spouse." *Id*. This was a technical change that did not have to go through the normal rulemaking process. *Id*. The proposed amendment was never made and the current Vital Statistics Rules continue to refer to "husband" rather than "each spouse." *Id*. at Ex. 2.  Since January 1, 2010, the IDHW is not aware of receiving any consents filed by any couples who conceive a child by artificial insemination. *Id*. at Ex. 3 at Answer to Interrogatory No. 15.

After the October 15, 2014 decision determining Idaho's ban on gay and lesbian marriage was unconstitutional, Jeremy Peterson, Deputy Registrar for the Bureau of Vital Statistics, wrote

an email on October 28, 2014 indicating how neighboring states were implementing changes in the issuance of birth certificates. *Id.* at Ex. 4 at IDHW-0029. On November 19, 2014, the Deputy State Registrar issued new "Procedures for Same Sex Parents on Birth Certificates." *Id.* at Ex. 5 IDHW-0010. The Procedures provided that "[i]f the birth mother delivers a child on or after October 15, 2014 and she was married to a female spouse at the time of birth, conception, or anytime between, the female spouse can be listed a second parent on the Idaho Certificate of Live Birth at the time of birth certificate entry." *Id.* The Procedures indicated a need to create "a new standard Mother's worksheet that will have allowances for husband, father, and female spouse that will be released shortly." *Id.* However, the new worksheets to implement the processing of birth certificates involving two female parents was not created until June 21, 2017. *Id.* at Ex. 6 IDHW-0052. At that time birth clerks were able to select "'**Married Female is Second Parent'** under the martial status question." *Id.* The Mother and Father version along with the Mother/Mother version were only available to the birth clerks at birthing facilities. *Id.* at Ex. 7 IDHW-0012. The new procedures and forms were not available to gay and lesbian parents prior to November 19, 2014. *Id.* at Ex. 8 IDHW-0013. The current procedures for completing the Idaho Certificate of Live Birth have not been updated since January 17, 2012. *Id.* at Ex. 9. The procedures only refer to mother and father and "father" is used with "husband." *Id.* at ¶ 10.

### III.  LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Rule 56(a). *See also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  "A 'material' fact is one that is relevant to an element of a claim or defense and whose existence might affect the outcome of the suit…. Disputes over irrelevant or unnecessary facts will not preclude a grant of summary

judgment." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir.

1987); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Deference to the

nonmoving party has limits, and the "mere scintilla of evidence in support of the [nonmoving

party's] position [is] insufficient." *Anderson*, 447 U.S. at 252.  The Court may not "make

credibility determinations," *T.W. Elec. Serv., Inc.,* 809 F.2d at 630, nor may it "disregard direct

evidence on the ground that no reasonable jury would believe it." *Leslie v. Grupo ICA*, 198 F.3d

1152, 1158 (9th Cir. 1999).  In addition, "the burden of the moving party may be discharged by

'showing'… that there is an absence of evidence to support the nonmoving party's case."

*Celotex Corp*, 477 U.S. at 325.

## IV.  ARGUMENT

### 1.  Claims Of Sexual Orientation Discrimination Are Subject To Heightened Scrutiny under the Equal Protection and Due Process Clauses.

The Equal Protection Clause provides that a State shall not "deny to any person within its

jurisdiction the equal protection of the laws." U.S. Const. Amend. XIV. Courts have long

recognized that "[c]lass legislation, discriminating against some and favoring others, is

prohibited." *Barbier v. Connolly*, 113 U.S. 27, 32 (1884). The Clause "is essentially a direction

that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living

Center, Inc*., 473 U.S. 432, 439 (1985). "The Constitution's guarantee of equality 'must at the

very least mean that a bare . . .  desire to harm a politically unpopular group cannot' justify

disparate treatment of that group." *U.S. Windsor*, ___ U.S. ___, 133 S.Ct. 2675, 2693 (2013)

(quoting *Dept. of Agric. v. Moreno,* 413 U.S. 528, 534-535, (1973)). In *Windsor*, the Court

invalidated the Defense of Marriage Act that barred the Federal Government from treating gay

and lesbian marriages as valid because it "impermissibly disparaged those same-sex

couples. . . ." *Obergefell,* 135 S. Ct. at 2597. "It is the identification of such a class by the law for

a separate and lesser public status that 'make[s] them unequal.'" *SmithKline Beecham Corp. v. Abbott Laboratories*, 740 F.3d 471, 482 (9th Cir. 2014) (quoting *Windsor*, 133 S.Ct. at 2694).

In *SmithKline*, the Ninth Circuit in reviewing classifications based on sexual orientation, held that "*Windsor* requires that heightened scrutiny be applied to equal protection claims involving sexual orientation." *Id.* at 481.[2] The Court found that "*Windsor* requires that classifications based on sexual orientation that impose inequality on gays and lesbians and send a message of second-class status be justified by some legitimate purpose." *Id.* at 482-483. The Ninth Circuit "acknowledged that gay and lesbian individuals have experienced significant discrimination." *Id.* at 484. The Ninth Circuit has affirmed that "[i]n *SmithKline*, we held that classifications on the basis of sexual orientation are subject to heightened scrutiny." *Latta v. Otter*, 771 F.3d 456, 468 (9th Cir. 2014).

The Ninth Circuit has recognized that "'[t]he Constitution cannot control such prejudices but neither can it tolerate them. Private biases may be outside the reach of the law, but the law cannot, directly or indirectly, give them effect.'" *Latta,* 771 F.3d at 471 (quoting *Palmore v. Sidoti,* 466 U.S. 429, 433 (1984)). "[P]rivate disapproval is a categorically inadequate justification for public injustice." *Id*. Whether analyzed under equal protection and due process principles, because of the inequality, stigma, and harm inflicted upon gay and lesbian couples, the Court should apply the heightened scrutiny analysis to evaluate the constitutionality of Idaho's Vital Statistics and Artificial Insemination statutes' discriminatory treatment of gay and lesbian couples.

---

[2] The purpose of heightened review is to ensure that such classifications are not used, "as they once were, . . . to create or perpetuate the legal, social, and economic inferiority" of different classes of persons in different ways and are "not hypothesized or invented *post hoc* in response to litigation." *U.S. v. Va.*, 518 U.S. 515, 533-534 (1996) (internal citation omitted).

**2. Claims Of Sex Discrimination Are Subject To Heightened Scrutiny under the Equal Protection and Due Process Clauses.**

"[S]tatutory classifications that distinguish between males and females are 'subject to scrutiny under the Equal Protection Clause.'" *Craig v. Boren*, 429 U.S. 190, 197 (1976) (quoting *Reed v. Reed*, 404 U.S. 71, 75 (1971)). Courts have repeatedly refused to uphold a state law that differentiates between individuals on the basis of immutable traits – such as sex or sexual orientation. *Reed*, 404 U.S. at 75. In *Reed*, the Supreme Court concluded that the Equal Protection Clause denies to "States the power to legislate that different treatment be accorded to persons placed by a statue into different classes on the basis of criteria wholly unrelated to the objective of that statute. A classification 'must be reasonable, not arbitrary, and must rest upon some ground of difference of having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike.'" *Id.* at 76 (*quoting Royster Guano Co. v. Virginia*, 253 U.S. 412, 415 (1920)).

The Supreme Court has consistently "subjected gender-based classifications to heightened scrutiny in recognition of the real danger that government policies that professedly are based on reasonable considerations in fact may be reflective of 'archaic and overbroad' generalizations about gender, . . ." *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 140–41 (1994) (citing *Reed*, 404 U.S. at 71). The burden under the intermediate level of scrutiny for sex discrimination is demanding. "Under our equal protection jurisprudence, gender-based classifications require 'an exceedingly persuasive justification' in order to survive constitutional scrutiny." *Id*. at 136 (citations omitted). Whether analyzed under the scrutiny for sex or sexual orientation discrimination, Idaho's Vital Statistics and Artificial Insemination statutes unconstitutionally discriminate against gay and lesbian couples.

**3. The Equal Protection and Due Process Clauses Protects Gay and Lesbian Couples From Discrimination.**

The Supreme Court has determined that the Due Process and Equal Protection Clauses protect against state laws that burden the liberty and equality of gay and lesbian couples and their children. *See generally Obergefell*, 135 S.Ct. 2584 (2015); *Windsor*, 133 S. Ct. 2675. In *Obergefell*, the Court noted that historically same-sex relationships were condemned as immoral and a crime. *Id.* at 2596. "Gays and lesbians were prohibited from most government employment, barred from military service, excluded under immigration laws, targeted by police, and burdened in their rights to associate." *Id.* The Supreme Court recognized a gay and lesbian couple's fundamental liberties "extend to certain personal choices central to individual dignity and autonomy, including intimate choices that define personal identity and beliefs." *Id.* at 2597. The Court held that when a State does not afford marital status to gay and lesbian couples that it has "the effect of teaching that gays and lesbians are unequal in important respects" and "impose[d] stigma and injury of the kind prohibited by our basic charter." *Id.* at 2602.

The Supreme Court found, with respect to an individual's parental status, "[t]here is no difference between same and opposite-sex couples, . . ." *Id.* at 2601. The inequality, stigma, and injuries noted by the Supreme Court in *Obergefell* would apply with equal force on States who deprive gay and lesbian couples' parental status for their children. Similar to parental status "[u]nder the Constitution, same-sex couples [sought] in marriage the same legal treatment as opposite-sex couples, and it would disparage their choices and diminish their personhood to deny them this right." *Id.* at 2602. The Court listed several difficulties that a gay and lesbian parent, such as Ms. Ayala, may confront daily in raising children that are non-biological. "If an emergency were to arise, schools and hospitals may treat the three children as if they had only one parent" and if one partner died "the other would have no legal rights over the children she

had not been permitted to adopt." *Id*. at 2594-95.[3] Here, Ms. Ayala confronts the same difficulties because the statutes do not recognize her parental rights and she was not allowed to be listed on L.O.A.'s birth certificate.

The Supreme Court determined that, "the challenged laws burden the liberty of gay and lesbian couples, and it must be further acknowledged that they abridge central precepts of equality" because they "are in essence unequal: same-sex couples are denied all the benefits afforded to opposite-sex couples and are barred from exercising a fundamental right" which includes parenting and raising a child. *Id*. The denial of the rights to a gay and lesbian parent and the right of a child to have both of her parents recognized under Idaho's Vital Statistics and Artificial Insemination statutes, "works a grave and continuing harm" and "serves to disrespect and subordinate them." *Id*. Idaho's statutes cannot withstand the heightened scrutiny required to justify the harm and infringement of the fundamental rights of gay and lesbian parents to parent and raise their children.

**4. Gay and Lesbian Couples and Their Children Have a Fundamental Right Under the Due Process Clause and Equal Protection Clause to Have Their Family Legally Recognized.**

An individual's right to procreate, raise, and care for a child is one of the oldest liberty interests protected by the Due Process Clause. *See Meyer v. Neb.*, 262 U.S. 390, 399 (1923). The status and dignity that come with society's recognition of legal parentage is unquestionably significant. Consequently, the government is only permitted to infringe on a parent's

---

[3] The Supreme Court noted that marital status conferred significant governmental rights, benefits, and responsibilities which would equally apply to conferring parental status to same-sex parents including: "taxation; inheritance and property rights; rules of intestate succession; . . . hospital access; medical decision making authority; adoption rights; the rights and benefits of survivors; birth and death certificates; . . . workers' compensation benefits; health insurance; and child custody, support and visitation rules." *Id*. at 2601. *See also* Appendix A.

fundamental right to a family relationship when the infringement is narrowly tailored to serve a compelling state interest. *Reno v. Flores*, 507 U.S. 292, 302 (1993).

The protected liberty interest under the Due Process Clause includes an individual's right to "establish a home and bring up children." *Meyer*, 262 U.S. at 399. The ability to choose and decide if and when to have a family, with whom to have children, and how to care for them is one of the most intimate and personal choices that an individual will face over her lifetime. The Constitution protects a "private realm of family life which the state cannot enter." *Prince v. Mass.*, 321 U.S. 158, 166 (1944)). The result is that courts have resolutely protected the "integrity of the family unit" against unlawful government intrusion. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *see also Prince*, 321 U.S. at 166.

An individual retains the fundamental right to parental status, regardless of an individual's sex or sexual orientation or whether they are unmarried or married. In *Obergefell*, the Supreme Court noted that, "the right to personal choice regarding marriage is inherent in the concept of individual liberties. . . **[l]ike choices concerning contraception, family relationships, procreation, and childrearing, all of which are protected by the Constitution** . . ." *Id*. at 2599 (emphasis added). A critical basis for the Supreme Court's finding that gay and lesbian couples had a fundamental right to marry was that in recognizing the right, "it safeguards children and families and thus draws meaning from related rights of childrearing, procreation, and education." *Id*. at 2600 (citation omitted). In the context of gay and lesbian couples it is undisputed that "many same-sex couples provide loving and nurturing homes to their children, whether biological or adopted," and that "gays and lesbians can create loving, supportive families." *Id*. Additionally, a "'child is not the mere creature of the State; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and

prepare him for additional obligations.'" *Troxell*, 530 U.S. at 65 (quoting *Pierce v. Socy. of Sisters*, 268 U.S. 510, 535 (1925)). At its essence this case is about the right to conceive a child to create a family and whether the person who raised and supports the child should be legally recognized by the State, regardless of who she loves or whether she is married.

Plaintiffs' challenge the Vital Statistics and Artificial Insemination statutes because they constitute an unlawful governmental interference with their fundamental rights to secure family relationships and make child rearing decisions. The interference arises from the unequal limitations and burdens that the statutes place on gay and lesbian parents, whether unmarried or married. The statutes do not provide for any mechanism by which Ms. Ayala or L.O.A. can obtain, in the eyes of the State, legal recognition of their parent-child relationship. Idaho's refusal to acknowledge Ms. Ayala and L.O.A.'s parent-child relationship interferes with both of their fundamental due process rights of privacy and liberty.

The Artificial Insemination statute unconstitutionally infringes on Ms. Ayala's fundamental rights. Ms. Ayala, with the birth mother's consent, should have the right to decide when and how to have a family. Idaho cannot deprive gay and lesbian couples of the right to make important decisions concerning the rearing of their children. Defendants' refusal to recognize Ms. Ayala and L.O.A.'s parent-child relationship unconstitutionally interferes with the "integrity of their family unit" and renders their relationship second class, not deserving of the "personal choices central to individual autonomy, including intimate choices that define personal identity and beliefs." *Obergefell*, 135 S. Ct. at 2599. There is no compelling interest or justification that warrants such an interference between consenting gay and lesbian couples.

The lack of a legal mechanism by which Plaintiffs can have their family status recognized by the State creates a second-class category of parents and families. Defendants should be

required to provide a procedure by which consenting gay and lesbian couples, whether unmarried or married, can obtain legal parentage.

5. **Idaho's Vital Statistics and Artificial Insemination Statutes Violate Plaintiffs' Constitutional Rights to Liberty and Equality under the Due Process and Equal Protection Clauses.**

The Artificial Insemination Act provides that "Artificial Insemination shall not be performed upon a woman without her prior written consent and the prior written request and consent of her husband." *See* I.C. § 39-5403(1). Once the mother's "husband" consents "[t]he relationship, rights, and obligations between a child born as a result of artificial insemination and the mother's husband shall be the same for all legal intents and purposes as if the child had been naturally and legitimately conceived by the mother and the mother's husband, . . ." *See* I.C. § 39-5405(3). A person who conceives a child by artificial insemination in violation of the physician and consent requirements of the Act commits a misdemeanor and is subject to up to six months, but not less than one month, of incarceration in a county jail and a fine of up to $500 or both. *See* I.C. § 39-5407 and I.C. § 18-303.

Idaho violates Ms. Ayala's and L.O.A's fundamental rights under the Equal Protection and Due Process Clauses because the Artificial Insemination Act discriminates on the basis of sexual orientation and sex under either the heightened or intermediate scrutiny analysis. The *Obergefell* and *Latta* decisions protect Ms. Ayala's fundamental rights as the parent of L.O.A. and allows her to exercise her rights as a gay and lesbian parent on an equal basis as an opposite-sex parent who conceives a child by artificial insemination. A state violates the concepts of liberty and equality if "[i]t imposes a disability on the class by refusing to acknowledge a status the State finds to be dignified and proper." *Windsor*, 133 S. Ct. at 2695. There is no legitimate justification for such unequal treatment of gay and lesbian and opposite-sex parents. *Latta*, 771

F.3d at 474 (citing *U.S. v. Va.*, 518 U.S. at 533 (1996)) ("explaining that justifications which 'rely on overbroad generalizations about the different talents, capacities, or preferences of males and females' are inadequate to survive heightened scrutiny.").

Defendants' refusal to recognize the parent-child relationship of Ms. Ayala and L.O.A. would not occur if Ms. Ayala was a different sex or had a different sexual orientation. For example, if Ms. Ayala was the male "husband" and married to the birth mom, she could have signed a consent under the Artificial Insemination Act that would have accorded her all the parental rights granted to a married opposite-sex parent of an artificially conceived child born in Idaho. Under these circumstances, she would have automatically been listed on the birth certificate. There would have been no requirement that she terminate the donor's parental rights and adopt L.O.A. to be recognized as her parent. Ms. Ayala should not be forced to undertake expensive, time consuming, and complicated termination and adoption proceedings in order to be recognized as L.O.A's parent when married opposite-sex parents can be recognized as parents by consenting to conceive a child by artificial insemination.

The Artificial Insemination Act limits the use of artificial conception to conceive a child to a married women's "husband." Because Ms. Ayala is female and due to her sexual orientation, Idaho prohibited Ms. Ayala from marrying her former female partner, the birth mother. Even if Ms. Ayala were married she would not be the male "husband" of a women. As a result, due to Ms. Ayala's sexual orientation and sex, and Idaho's prohibition against gay and lesbian marriages, the Artificial Insemination Act treats her unequally by depriving her of the legal status and rights that are afforded to a married women and her male "husband" without any justification.

Idaho may not continue to limit the right of consenting adults to conceive a child under the Artificial Insemination Act to only male "husbands" who are married to women.[4] Defendants recognized that limiting the right to conceive to "husbands" was suspect after the *Obergefell* and *Latta* decisions declaring Idaho's same-sex marriage ban unconstitutional. Yet the proposed amendment was never made, and the current Vital Statistics Rules continue to refer to "husband" rather than "each spouse." Dec. HB Ex. 2. Defendants' information for completing birth certificates still has not been updated to reflect any change in the procedures. *Id*. at Ex. 9. The Idaho Supreme Court has recently deferred to the legislature to address the discriminatory affect the Act has on gay and lesbian couples.[5]

It is beyond dispute that "'[t]he freedom secured by the Constitution consists, in one of its essential dimensions, of the right of the individual not to be injured by the unlawful exercise of governmental power." *Obergefell*, 135 S. Ct. at 2605 (quoting *Schuette v. BAMN*, 572 U.S. ___, 134 S. Ct. 1623, 1636 (2014)). "Thus, when the rights of persons are violated, 'the Constitution requires redress by the courts . . .'" *Id*. (quoting *Schuette*, 134 S. Ct. at 1637). "An individual can invoke a right to constitutional protection when he or she is harmed, even if the broader public

---

[4] On October 22, 2014, Frank Powell, an IDHW Rules Specialist, recommended a change in the Vital Statistics Rules, 16.02.08.900.01, Dec. HB at Ex. 1 at 0054-0055. Mr. Powell suggested the "Form of Consent" rule be amended by changing "wife" and "husband" to "each spouse." *Id*. This was a technical change that did not have to go through the normal rulemaking process. *Id*.

[5] In *Doe v. Doe I*, 162 Idaho 254, ---, 395 P.3d 1287, 1290 (Idaho 2017), the Idaho Supreme Court considered whether a former same-sex partner had any custodial or visitation rights to a child conceived during a committed relationship under the Artificial Insemination Act. The Court held that the former partner had no rights. The Court held that "[w]here the legislature has not seen fit to provide substantive legal grounds on which a court can base a requested declaration, then it is outside of the authority of that court to make said declaration, even when it would further the interests of all parties involved (as here)." (*Cf. A.C. v. N.J.*, 1 N.E. 3d 685, 690 (Ind. Ct. App.  2013) involving a child conceived by artificial insemination to an unmarried same-sex couple where the Court held that it was the duty of the courts to help legislatures "protect children who, through no choice of their own, find themselves born into unconventional familial settings. Until the legislature enters this arena, however, [courts] are left to fashion the common law to define, declare, and protect the rights of these children.").

disagrees and even if the legislature refuses to act." *Id*. Plaintiffs have been harmed by Defendants' refusal to recognize their constitutional rights and the Court should protect their rights even though the Idaho Supreme Court or Idaho officials may not agree.

In *Eisenstadt v. Baird*, the Supreme Court addressed the rights of unmarried persons denied access to contraceptives under the Equal Protection and Due Process Clauses. *Id*. 405 U.S. 438, 443 (1972). A Massachusetts' statute made it a criminal offense for a single person to obtain contraceptives to prevent pregnancy. *Id*. at 442. The State's asserted interest was to protect the health of its citizens and to "'regulate the private sexual lives of single persons.'" *Id*. The Court found "[t]he question for our determination in this case is whether there is some ground of difference that rationally explains the different treatment accorded married and unmarried persons'" under Massachusetts law. *Id*. at 447. The Court held "that no such ground exists." *Id*. at 448. The Court held:

> [W]hatever the rights of the individual to access to contraceptives may be, the rights must be the same for the unmarried and the married alike. . . . If the right of privacy [under *Griswold v. Connecticut*, 381 U.S. 479 (1965)] means anything, it is the right of the individual, married or single, to be free from unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child. . . .
>
> On the other hand, if *Griswold* is no bar to a prohibition on the distribution of contraceptives, the State could not, consistently with the Equal Protection Clause, outlaw distribution to unmarried but not to married persons.

*Eisenstadt* at 453-454 (citations omitted).

Idaho cannot unilaterally prohibit a consenting unmarried couple, same-sex or opposite sex, from conceiving a child. Defendants offer no justification or interest for discriminating between married and unmarried opposite sex couples or married and unmarried same-sex couples who want to conceive a child using artificial insemination. Idaho has not shown any willingness in enforcing any justification or interest for limiting the conception of children by

artificial insemination to only married couples. Since January 1, 2010, the IDHW has stated it is not aware of receiving any consents filed by any married couples who undergo artificial insemination. Dec. HB at Ex. 3 Answer to Interrogatory No. 15. This establishes that there is no justification or interest that explains the different treatment accorded married and unmarried couples since Defendants fail to enforce the statutory requirements and have not taken steps to preserve or protect any limitation between married and unmarried couples.

The discriminatory impact on L.O.A. if she were to lose the only parent she has known and the parent who has raised her would be devastating. The attachment between a parent and child is not a function of marital status, sex, sexual orientation or how the child was conceived. The nature of Ms. Ayala's and L.O.A.'s relationship is far more important than between a distributor of contraceptives and an unmarried person in *Eisenstadt*. Since the *Eisenstadt* decision any stigma associated with unmarried women giving birth has evaporated into irrelevance. In 2015, there were 1,601,527 live births to unmarried women in United States.[6] The percentage of all births in the United States to unmarried women was 40.3%. *Id*. There is no justification for prohibiting and criminalizing unmarried couples who consent to artificial insemination to conceive a child. The state has no justification or interest in interfering with "the right of the individual, married or single, to be free from unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child." *Eisenstadt* at 453.

---

[6] *See* National Vital Statistics Reports, Volume 66, Number 1, January 5, 2017, U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, Centers for Disease Control and Prevention, National Center for Health Statistics, National Vital Statistics System. www.cdc.gov/nchs/data/nvsr/nvsr66/nvsr66_01.pdf.

The Equal Protection Clause denies the "State the power to legislate that different treatment be accorded to persons placed by a statute into different classes on the basis of criteria wholly unrelated to the objective of that statute." *Eisenstadt*, 405 U.S. at 447. Ms. Ayala and L.O.A. have an equal claim to State benefits and rights accorded married opposite sex couples, including being able to consent to artificial insemination and receive birth certificates. There is no justification for the unequal treatment imposed upon gay and lesbian parents, whether unmarried and married, or the State's interference with their intimate choices that define their personal identity.

As the Ninth Circuit observed, for gay and lesbian parents "[l]ike all human beings, their lives are given greater meaning by their intimate, loving, committed relationships with their partners and children." *Latta*, 771 F.3d at 467. Ms. Ayala and L.O.A. are equally deserving of the legal status and protections the Ninth Circuit afforded to the gay and lesbian couples because parental status, similar to marriage, is "'[t]he common vocabulary of family life and belonging that other[s] [ ] may take for granted' is, as the Idaho plaintiffs put it, denied to them—as are all of the concrete legal rights, responsibilities, and financial benefits afforded opposite-sex married couples by state and federal law—merely because of their sexual orientation." *Id.* (footnote omitted).

Idaho's Vital Statistics and Artificial Insemination statutes "humiliates . . . children now being raised by same-sex couples" who Idaho prohibited from being married or are unmarried when they conceive and give birth. *Windsor*, 133 S.Ct. at 2694. "The law in question makes it even more difficult for the children to understand the integrity and closeness of their own family and its concord with other families in their community and in their daily lives." *Id.* "Same-sex couples are consigned to an instability many opposite-sex couples would deem intolerable in

their own lives." *Obergefell*, 135 S.Ct. at 2601. Ms. Ayala, since the time of L.O.A.'s conception and birth, has consistently acted as her parent by providing her with a loving, caring and supportive relationship and addresses her emotional and physical needs. Without legal recognition of Plaintiffs' parent-child relationship, Ms. Ayala and L.O.A. will be unable to realize rights, protections, and benefits that are routinely provided to opposite-sex parents and their children. *See* Appendix A. The Court should recognize and enforce Ms. Ayala's and L.O.A.'s right to be treated equally under Idaho's statutes.

## CONCLUSION

The Court should protect and recognize Ms. Ayala's fundamental right as the parent of L.O.A so they can receive the same legal protections and benefits derived from the parent-child relationship as a child with opposite sex parents. The Court should require Defendants to apply Idaho's Vital Statistics Act and Artificial Insemination Act in a sex-neutral manner, recognize the parentage of same-sex and opposite sex couples and their children without regard to their marital status, and order Defendants to issue Plaintiffs an amended two-parent birth certificate recognizing Plaintiff Ayala as the parent of her daughter, L.O.A. and amend its rules and procedures to recognize the rights of gay and lesbian couples.

Dated this 1st of February, 2018.

/s/ Howard A. Belodoff
Attorneys for Plaintiffs

CERTIFICATE OF SERVICE

      I hereby certify that on the 1st of February, 2018, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which sent a Notice of Electronic Filing to the following persons:

| | | |
|---|---|---|
| Lawrence G. Wasden | Steven L. Olsen | W. Scott Zanzig |
| Attorney General | Chief of Civil Litigation | Deputy Attorney General |
| | steven.olsen@ag.idaho.gov | scott.zanzig@ag.idaho.gov |

<u>/s/ Howard A. Belodoff</u>
Howard A. Belodoff

APPENDIX A

| LEGAL AUTHORITY | BENEFIT/PRIVILEGE |
|---|---|
| I.C. § 32-717A: *Parents' Access to Records and Information* | <ul><li>Authorize medical care</li><li>Enroll in school and extracurricular activities</li><li>Access medical, health, and dental records</li><li>Access school and educational records</li></ul> |
| I.C. § 32-717B: *Joint Custody* | <ul><li>Presumption of joint custody and authorized to seek a court order for legal and physical custody and visitation</li></ul> |
| I.C. § 32-1011: *Parental Right to Care, Custody and Control of Children* | <ul><li>Permitted to make decisions concerning the care, custody, and control</li></ul> |